## THE DECISIONS

OF

# THE SUPREME COURT OF ALABAMA

CONTINUATION OF

JANUARY TERM, 1837.

---

### DRIVER VS FORTNER.

*Points as to fraud, in the sale of trust property, by
a creditor.
As to evidence in Chancery causes.
As to prayer for relief, in a bill in Chancery.*

1. Where A. executed a deed of trust in favor of B. to secure
the payment of a debt, and after fruitless efforts for set-
tlement, which were resisted by B. the latter endeavor-
ed to force a sale of slaves under the deed, to prevent
which, A applied for, and obtained an injunction; and B,
exerted himself to prevent A from obtaining the necessary
surety, and upon the sale of the trust property, demanded
specie—whereby it appeared that the slaves were sold at a
loss to A. On a bill filed by A, it was held—
2. First—That equity had the power to set aside the sale, un-

5 P. 2

der the trust deed, on the ground, that equity is authorised to take from a party, or third person, the benefit derived from his fraud, by the prevention of an act to be done by another: and B, having by false representations, prevented A from litigating his rig' ts before the sale, he should not have benefit from his purchase at the sale, but that the slaves should be held as a security, for the amount due upon the debt secured by the deed—liable to a return to A, on payment of the trust debt.

3. Secondly—That a payment made by A to B, without particular direction as to its application, might well be applied by B, to the payment of a debt, other than that secured by the trust deed.

4. Thirdly—That a payment made by A to B, and charged to have been extorted as usurious interest—the usury not being denied by B, in his answer, but avoided; and no proof being made, that the payment was applied to the benefit of A, should be credited against the trust debt.

5. *It seems*, that one having a lien upon property, liable to waste or loss, might well stipulate with his debtor to have it insured; and might receive a *premium*, and take the risk himself—provided the transaction be *bona fide*.

6. A bill for an injunction, not filed as an original, the order upon which has not been complied with, cannot be considered a record of Court, so as, of itself, to become evidence in a suit in Chancery, between the same parties.

7. Though, *it seems*, a bill in Chancery, basing its material allegations upon such bill for injunction, and its existence being admitted by the answer, might dispense with proof of it.

8. The prayer of a bill in Chancery, is an essential part, and without its insertion, no decree can be rendered for a complainant.

9. Under a general prayer for relief, with or without a special prayer, a Court of Chancery, will award such relief as may be made out by the bill, or as is consistent with the cause, though variant from relief specially prayed.

10. But where specific relief only is prayed, Chancery will not go further than its terms require.

The defendant in error exhibited his bill on the equity side of the Circuit Court of Madison, setting forth, that on the eleventh day of May, eighteen hundred and thirty, he executed a deed of trust to Thomas J. Sumner, as trustee, for the benefit of the plaintiff, which was intended to secure the payment of a note, given by the defendant to the plaintiff, on the fifteenth of January, eighteen hundred and thirty, for the sum of two hundred dollars, with interest from the date, due on the first day of March, eighteen hundred and thirty one.—That, about the third day of June, next after the maturity of the note, the defendant being hard pressed for money, went to the plaintiff and informed him of his embarrassments, and his reluctance to part with his property embraced in the deed, in as much as they were three family negroes; and paid him ninety-seven dollars in the paper currency of the country, which was then selling at a discount, that reduced it to ninety-five dollars and thirty-five cents. The defendant, being unable to pay the balance, offered a per cent. above the legal interest, for time, whereupon, the plaintiff agreed to give time, until the first of March, eighteen hundred and thirty-two, if the defendant would, in addition to legal interest, pay *thirty per cent.*—to this he refused to assent—stating that he had rather have his property sacrificed by a forced sale, under the deed; and requested the plaintiff to return to him the money he had paid him, and resort to the deed. But, this the plaintiff declined doing, saying he had the money, and intended keeping it—and then credited the note with twenty-seven dollars, applying

eighteen dollars and twenty-seven cents to the payment of a small note he held against the defendant, and the balance to the payment of usurious interest, against his directions.

It was further shewn, by the bill, that on the fourth of June, eighteen hundred and thirty-two, the defendant having procured an acceptance in the plaintiff's favor, for forty to sixty dollars, and expecting in a few minutes, to receive enough money for the purpose, determined to pay off the note with the demand of *thirty per cent.* as a *premium* for delay; but was surprised, on informing the plaintiff of his intention, to learn, that he still demanded, in addition to the payment he had received, two hundred and seventy dollars. This sum the defendant promptly refused to pay—whereupon, the plaintiff endeavored to force him to pay it.

The bill also showed, that immediately after a failure to settle, the plaintiff had caused to be published, a notice for the sale of the negroes under the deed, on the eighteenth of June, eighteen hundred and thirty-two; and that the defendant, a few days before the day of sale, applied for, and obtained an order for an injunction, inhibiting the sale upon the payment by him, of one hundred and twenty six dollars and sixty-five cents, to the clerk of the Circuit Court of Madison, and entering into bond, with sufficient security, in one hundred dollars. The plaintiff, that he might purchase the negroes at a great sacrifice, was sedulous in his efforts to prevent the defendant from giving the bond, provided for by the order, by falsely reporting his insolvency—that he owed large sums of money, &c.

That the plaintiff objected to, and induced the clerk to refuse a surety who was tendered, falsely representing him to be insolvent.—That he followed the defendant, and would dissuade every person from becoming his surety, whom the defendant would solicit; and did actually prevent a Mr. Brandon from becoming such, by his misrepresentations.

It was further shewn that the plaintiff interposed similar obstacles to the collection of money by the defendant, by forbidding the man who accepted the order, for from forty to sixty dollars in his favor; (but which had never been delivered to him, and for which he had never given value,) not to pay the amount to the defendant. And further—that the plaintiff directed the clerk to receive nothing but "*specie dollars*;" and inhibited him from receiving United States' Bank notes, at any discount—that the defendant found it impracticable, under the circumstances, to give the surety, and to procure the specie. A sale, of course, took place, at which it was announced, that nothing but *specie* would be received. The few persons who attended the sale, were taken by surprise, and two or three of them, were in search of *specie*, when two of the negroes were bid off by one B. Metcalf, for the plaintiff, at the price of two hundred and twenty-nine dollars, a price, which it was alleged, was much below their true value—and the plaintiff refused to pay to the defendant, any excess, after discharging the demands of the deed, save only the sum of seven dollars and eighty cents; which he declined receiving.

The bill after many interrogatories, concluded with the following prayer : "And may it please your Honor, to grant the States' most gracious writ of *subpœna,* commanding &c. and that on final hearing, said defendant be compelled to deliver to your orator, the said two negroes; on condition that your orator pay the balance of the said note, in said deed specified, with the interest, after deducting the said ninety-five dollars and thirty five cents ; or if said negroes or either of them, should in the meantime die, the defendant be decreed to pay the sum of four hundred and fifty dollars, said debt being deducted, and that in either case, defendant be bound to cancel the said note, and this your orator, as in duty bound, will ever pray, &c."

To this bill, the plaintiff in error, answered, admitting the sale of the negroes, under the deed of trust, and the purchase by him, for two hundred and twenty-nine dollars,—that a requisition was made of *specie,* but that he acted openly and fairly in this. He denied all oppression or unfairness in the sale—denied that he exacted two hundred and seventy dollars of the defendant, or any sum beyond what was actually due; that after the sale, he tendered to the defendant, but seven dollars and eighty cents, because this was the entire balance—denied that he ever endeavored to prevent any one from becoming the defendant's surety. He admitted that he represented to some persons, and particularly to Mr. Brandon, that he thought the complainant insolvent; but these representations were made in consequence of inquiries made of him. The plaintiff admited that he objected to the sufficiency of the

surety offered to the clerk—and did so, because he was a poor man, of doubtful ability. He admited the receipt of ninety-five dollars and thirty-five cents; but denied that he appropriated it otherwise than as defendant directed—denied the reception of usurious interest—stated that defendant asked of him indulgence on his note, which he refused; but assented afterwards to allow it, upon defendant's representing, two of the three slaves, to be small and of little value, and if then sold, he would be deprived of the third, (their mother,) who would also have to be sold to pay the debt. Whereupon, the fifty dollars was taken, as a fair equivalent for the risk of loss, by death or otherwise, of the negroes.

The Chancellor below, rendered a decree, setting aside the sale under the deed; and the plaintiff took a writ of error.

*McClung*, for plaintiff in error—*Robinson*, contra.

COLLIER, J.—The questions of fact, arising upon the bill and answer, touching which they are in conflict, and which are to be determined by the proof in the cause, are these:

First—Did the plaintiff fraudulently prevent the defendant, by false statements or otherwise, from complying with the conditions of the order, for the issuance of an injunction?

Second—Did the plaintiff refuse to allow to the defendant, all proper credits upon the debt secured by the deed of trust?

Third—If the plaintiff prevented a compliance with the terms of the order, for an injunction, has the defendant sustained an injury thereby?

Several witnesses were examined at the instance of the defendant, and their depositions were read on hearing in the Circuit Court. William Brandon, whose deposition stood first in order, said that he consented to become the defendant's surety in the bond, for an injunction, if the defendant would give him a deed of trust, on *the negroes*. But the plaintiff said to him, that if he became the defendant's surety, and received a deed of trust on the negroes, the negroes would be taken from him, by execution, then in the hands of one Flanagan. The plaintiff then asked witness, if he would become the surety of such a rascal as the defendant, and thereby prevent an honest man from collecting a just debt, to which witness replied that he would become his surety, if he would make him safe.— Plaintiff then remarked to witness, that he had no means to make him safe, and that what property he had, would not pay his just debts.

William D. Hollowell, a witness for defendant, stated, that in the Spring of eighteen hundred and thirty-two, he accepted a conditional order, drawn by the defendant in favor of the plaintiff, for from forty to sixty dollars. He did not know whether this order was to be credited on the deed of trust, but recollected, that the plaintiff stated, he had a deed of trust, the whole or a part of which, the defendant was to settle on that day—he did not know that his acceptance went into the plaintiff's hands. Some altercation took place between the parties, in the course of their settlement, the particulars of which, he did not know, having withdrawn from where they were. The witness was prevented by

the plaintiff, from paying to the defendant, the amount he was owing him, (defendant,) by giving the witness notice, that he would hold him responsible. At the sale, the witness recollected that the plaintiff was a bidder.

Lemuel Mead, was examined at the instance of the defendant. This witness was the clerk, to whom the order for an injunction was directed, and said, that, about that time, the plaintiff stated to him, that the defendant was insolvent, or would be so, and that he had claims against him, to the amount of six hundred dollars.

The defendant offered one Anyan, as a surety for the injunction—The plaintiff objected to him, saying, either that he was insolvent, or his engagements were as large as he could meet, and threatened to make witness liable, if he accepted him: the witness thought, he understood from both parties, that the plaintiff had forbid Hollowell from paying to the defendant, the sum due from him; and that for the cash, directed by the order for an injunction, he was directed to receive nothing but *specie*.

At the sale, the plaintiff proclaimed that nothing but specie would be received, not even United States' Bank notes, at twenty-five per cent. and witness thought he said, even fifty per cent. discount. The demand of specie, he thought, prevented the negroes from selling for as much, as they otherwise would have done, from fifty to seventy dollars— perhaps not so much.

William Echols, in his examination, stated that he considered Anyan, (the individual who was offered by the defendant as his surety to the clerk,)

5 P.    3

as solvent; and that the difference between the currency of the country, and *specie*, was refused at the sale, and that but for the requisition of *specie*, he thought the negroes would have sold for three hundred dollars.

Joseph B. Bradford, said, that at the meeting of the parties, which took place in his counting room, a short time previous to the sale, and when they appeared to be endeavoring to settle, an altercation took place and violence ensued.

B. Metcalf, thought the value of the negroes, at the time of the sale, was about two hundred and thirty dollars. About the time of the sale, he heard the plaintiff tell Hollowell, that he should hold him responsible on his acceptance.

Stephen S. Ewing, thought the negroes were well worth two hundred and fifty dollars—heard plaintiff say that no good man or honest man would become the defendant's surety, assigning as a reason, that he was a bad man. Witness thought that plaintiff was unwilling for defendant to give the surety required—thought Anyan was solvent for two hundred dollars. He said, it was proclaimed by the plaintiff, at the sale, that specie would be required, and that United States' money would not be received at twenty-five *per cent* discount; but witness thought there would not have been much difficulty in procuring the *specie*.

B. S. Anyan stated, that the plaintiff, in conversation with him, denied having received usury of the defendant, and speaking of him in most disreputable terms, said he did not believe that he could give the security for the injunction. Witness stated, that

when he was offered to, and rejected by the clerk, as a surety for the defendant, he was worth not less than six hundred dollars.

Joseph Pickens, thought the negroes worth, at least, one hundred and fifty dollars, each, and that he should have thought Anyan, good, for at least, six hundred dollars.

Miles McMillian said, that he did not think himself very capable of determining the value of the negroes, but could not give more than three hundred dollars, without informing how much he thought them to be worth.

This closes an abstract of the testimony, so far as it is material to the points in controversy.

The Circuit Court, by its decree, set aside the sale, made the Sheriff a trustee to execute the trust under the deed, and substantially granted the prayer of the bill.

In respect to the first question to be examined upon the bill and answer, we think that the proofs in the cause, very satisfactorily shew, that the plaintiff in error, by representations which he has not only failed to make good by proof, but which are disproved, did prevent the defendant from cemplying with the conditions of the order, for an injunction to restrain the sale of his negroes, under the deed of trust. Anyan, who was offered to the clerk, was entirely sufficient; yet the plaintiff objected to his reception, and threatened to charge the clerk, if he accepted him.

Brandon, who had consented to become the defendant's surety, (upon receiving a deed of trust upon the negroes, embraced in the deed already

referred to,) was prevented by the statement of the plaintiff, that he was insolvent, and that a deed for Brandon's benefit, would be over-reached by executions of an older date. Lastly, his repeated representations, (and when not applied to for information,) that the defendant was, or soon would be insolvent, and that he wanted moral principle, were well calculated to prevent all who wished to maintain friendly relations with the plaintiff, or who were not particularly friendly with the defendant, from lending him their aid.

The plaintiff, not only prevented the defendant from giving the surety, but also from procuring the money, to make the deposite with the clerk, which the order contemplated. This sufficiently appears, by his forbidding Hollowell, not to pay to the defendant, the sum for which he had once accepted in favor of the plaintiff, but the right to which, still remained in the defendant.

Whether the demand of *specie* was intended to prevent a compliance or not, to say the least of it, the refusal to receive United States' Bank notes, or the currency of the country, at a discount, above, what was the fair rate of exchange, was out of the usual course of dealing; and we can but think, manifested a disposition to oppress, however legitimate such a course of procedure might be.

Our conclusion upon the facts, is, that the evidence proves, the plaintiff did fraudulently prevent, by false statements, the defendant from prosecuting a suit upon his bill, for an injunction—in consequence of which, the sale of the slaves, under the deed of trust, was made without his option.

Let us now inquire, whether, the powers of equity are adequate to afford redress.

"Fraud," it is said, "is infinite;" hence, a Court of equity, cannot prescribe any fixed or invariable rules, as to the extent to which it will go, in relieving against it. Were the Court, to say, "thus far we will go, and no farther," the ingenuity of man would soon devise shifts to baffle its powers. Without pretending to define the vast variety of positive and constructive frauds, against which Chancery relieves, we will proceed at once, to show that the case at bar, comes within the principle of the rule, which authorises equity to take from a party, the benefit he may have derived from his own fraud, by the prevention of an act, to be done for a third person. To shew that this doctrine is considered as settled, we refer to 1 *Story's Eq.* (258.)

The learned author, thus lays it down: "Courts of Equity hold themselves entirely competent to take from third persons, and *a fortiori*, from the party himself, the benefit which he may have derived from his own fraud, imposition or undue influence, in procuring the suppression of such acts."

In *Maester vs Gillespie*,[*] by the application of this principle, it was held that a devisee, who prevents a testator from charging his estate with a legacy, by telling him it is unnecessary to give himself that trouble—that it should be paid, shall be chargeable in Equity, as he prevented an effectual charge. [*11 Ves. 638.]

And Lord *Eldon*, in *Huguenin vs Boseley*,[†] says, "I should regret that any doubt could be entertained, whether it is not competent for a Court of equity to take away from third persons, the benefit [† 14 Ves. 288.]

which they have derived, from the fraud, imposition and undue influence of others."

*2Ves.629     And the case of *Bridgeman vs Green*,* is noticed, as an express authority, in which Lord *Hardwicke* observed, " If a person could get out of the reach of the doctrine and principle of this Court, by giving interests to third persons, instead of reserving them to himself, it would be almost impossible ever to reach a case of fraud."

This last case came before the Lords Commissioners, when Lord Chief Justice *Wilmot*, expressed himself in strong terms to the same effect.— And Lord *Thurlow*, in the case of *Luttrell vs Waltham*, maintained the same doctrine, as being well known in Equity, and considered it clear, even in favor of a volunteer, that the intention of a tenant in tail, who was prevented from completing a recovery, by the fraud of a person whose wife was entitled in remainder, should not be defeated; and held that the estate should be treated as if a recovery had been suffered.

To apply the principle of these authorities.— The plaintiff having, by representations which he failed to make good by proof, prevented the defendant from litigating his rights before the sale, he should not derive any advantage from his purchase of the negroes; but should hold them as a security for so much as is due upon the debt secured by the deed, and be liable to return them to the defendant, when that debt is extinguished. The proof, showing the sale and purchase, so far as the plaintiff is concerned, to be the result of fraud, can not be upheld in Equity, if the defendant has been injured by it.

All the witnesses, with the exception of Mr. Metcalf, concur in the belief, that the negroes sold at a sum below what they were worth. One witness thinks that they were worth twenty dollars more than they sold for, while all the others think they were sold from fifty to seventy dollars less than a fair price. It is then manifest, that the defendant has sustained a loss by the sale.

In regard to the payment of the ninety-five dollars and thirty-five cents, there is an absence of proof of any direction being given as to its application, at the time of payment. The plaintiff then had the right to appropriate so much of it as was necessary to extinguish the small note; and as it does not appear that he had other demands than that secured by the deed of trust, that should have been credited by the balance remaining in his hands.

The plaintiff in error den'es the reception of usurious interest, and insists, that he considered fifty dollars of the sum paid him, a fair equivalent for the risk he would run of losing his claim by the death of the negroes conveyed by the deed.— This statement in the answer, is not a direct denial of the allegation in the bill, which drew it forth; but is rather in avoidance, and according to the rules of procedure in equity, must be proved.— There being, then, no proof that the plaintiff applied it, for the benefit of the defendant, the latter may claim it as a credit upon the debt in controversy.

We do not pretend to intimate an opinion, that a party who has a lien upon property liable to

waste or loss may not stipulate with his debtor, to have it insured—nor can we discover any objection to his receiving a *premium*, and taking the risk himself, if the transaction be fair and *bona fide*.

The bill on which the defendant obtained an order for an injunction, could not be considered as a record of the Circuit Court. To impart to it this character, it was necessary that the terms of the order, on which process was awarded, should have been complied with, or that the bill had been filed as an original. Until this was done, it was the private paper of the defendant, and could not have been authenticated by the certificate of the clerk, but should have been proved by deposition. Had it been an exhibit with the bill, it might have been proved by a witness examined *ore tenus*, at the hearing.*

*3 Bibb R. 157.

However a paper may be offered, whether as a writing refered to in the pleadings, or as an exhibit in the cause, the Judge presiding, cannot by the mere recognition of its genuineness, authorise it to be used as evidence. So that in the admission of the bill, affidavit and order, upon the knowledge he professed to have of the hand writing of the parties whose respective acts were before him, it is believed that the Judge of the Circuit Court, erred. Yet the error is one, by which neither party could be injured, for the present bill, refers to the bill and order for an injunction, and predicates some of its most material allegations upon it; and the answer, (if not directly,) does by implication, admit the exhibition of such bill, and the order for an injunction. This

DRIVER *vs* FORTNER.

dispensed with all proof in regard to it, and renders the objectionable evidence, superfluous.

Though the defendant has made out a good title to relief in Equity, yet he does not ask such relief by the prayer of his bill, as his case requires. He asks that the negroes may be delivered up to him, on the payment of so much of the debt as may still remain unpaid, after deducting the sum of ninety-five dollars and thirty five cents, which he had paid the plaintiff; or if either of the negroes die in the meantime, that four hundred and fifty dollars be decreed to be paid him, after deducting therefrom, so much of the debt as may be due; and that in either case, the note be cancelled.

The first branch of the prayer, supposes that the sale is to be set aside, and thus far, may be proper enough. But upon this being done, the practice of a Court of Equity requires, that it should make such disposition of the cause, as may prevent further litigation, and be definite upon the rights of the parties. To do this, it is necessary to ascertain how much is yet due upon the debt secured by the deed, that a decree may be rendered for this sum; and to ascertain the terms of the deed, so that the negroes may be again sold at the place where, and the time when, it directs; unless the debt should be paid, so as to render a sale unnecessary. To make such a decree, there should be some proof of the deed.— This may, however, not be indispensable, and as the plaintiff has not exhibited it by his answer, as called on to do, the Court may proceed without it, taking care to direct a sale on terms, quite as beneficial to him, as the deed contemplates.

5P.          4

The prayer of a bill is deemed an essential part of it, and if it want it, no decree can be rendered in favor of the complainant.

Bills usually seek both specific and general relief, viz: That certain things therein expressed, may be decreed, "and that the complainant may have such other or further relief, as shall seem meet, or the case may require." If this latter prayer be made, the Court will adjudge to the complainant, such relief as is compatible with the case made out by the bill; although it be other than that specially asked: and even if the special prayer be wholly omitted, it is competent under the general prayer, to give the proper relief. But if a bill ask for specific relief only, the Court is confined in its action to the special prayer, and cannot go beyond it.*

*2 Atk. 3-
Ibid. 141-
3 Ibid. 132
2 Ves. 225
13 Ves jr.
114.
2 Peters
R. 595.

In the present case, the bill has no prayer for general relief; and the special prayer is not such as to authorise us to adjudge, finally, the rights and interests of the parties. The decree of the Circuit Court being erroneous, the same is reversed, and the cause remanded, that the defendant may obtain leave to amend his bill, if he wishes, so as to have the relief we have indicated, to be proper. And it is further decreed, that each party pay his own costs, in this Court.

HOPKINS, C. J. not sitting.